# Illinois Official Reports

## Appellate Court

*People v. Coleman*, 2015 IL App (4th) 131045

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CASSIAN T. COLEMAN, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-13-1045 |
| Filed | January 6, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the third-stage dismissal of defendant's postconviction petition alleging that his trial counsel was ineffective by entering into a stipulation that excused the State from proving that the weight of the substance containing cocaine that defendant possessed was "900 grams or more" and that the State violated *Brady* by failing to disclose to defendant's trial counsel prior to the stipulation that the State had commingled the powder from 15 separate bags before sending the commingled powder to the laboratory, the appellate court reversed defendant's conviction for unlawful delivery of 900 grams or more of a substance containing cocaine and his sentence to 25 years' imprisonment and remanded the cause for resentencing on a lesser included offense, since the stipulation freed the State from testing each of the 15 different bags, which could have contained a look-alike substance, and that prejudiced the defense with respect to defendant's sentence. |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 06-CF-448; the Hon. Katherine M. McCarthy, Judge, presiding. |
| Judgment | Reversed; cause remanded with directions. |

Counsel on Appeal  Michael J. Pelletier, Jacqueline L. Bullard, and Allen H. Andrews, all of State Appellate Defender's Office, of Springfield, for appellant.

Jay Scott, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel  JUSTICE APPLETON delivered the judgment of the court, with opinion.
Presiding Justice Pope and Justice Steigmann concurred in the judgment and opinion.

## OPINION

¶ 1 Defendant, Cassian T. Coleman, is serving 25 years' imprisonment for unlawfully delivering 900 grams or more of a substance containing cocaine, an offense he committed while having a prior conviction of unlawful delivery of a controlled substance (720 ILCS 570/401(a)(2)(D) (West 2006)). He appeals from the third-stage dismissal of his petition for postconviction relief. See *People v. Harris*, 2013 IL App (1st) 111351, ¶¶ 46-47 (describing the three stages of a postconviction proceeding).

¶ 2 Defendant makes two claims in his petition. The first claim is that his trial counsel rendered ineffective assistance by entering into a stipulation that rescued the State from having to prove the unprovable, namely, that the weight of the illegal substance defendant possessed was "900 grams or more" (720 ILCS 570/401(a)(2)(D) (West 2006)). Trial counsel stipulated that a chemical analysis by a forensic scientist, Michael Cravens, had shown People's exhibit No. 2 to be "926.0 grams of cocaine." As it later emerged in the trial, however, a police officer commingled the powder from 15 separate bags before sending the commingled powder, People's exhibit No. 2, to the laboratory. Thus, the substances in the 15 bags were never separately tested to determine whether each of them, individually, was indeed a substance containing cocaine. That would have been an insuperable problem for the State, defendant argues, and would have resulted in substantially less prison time for him, if only his trial counsel had not precipitously entered into the stipulation that the 926 grams–and hence, by necessary implication, the 15 substances comprising the 926 grams–were "cocaine" (as opposed to cocaine plus some other ingredient).

¶ 3 Defendant's second claim is that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the commingling to trial counsel before he entered into the stipulation.

¶ 4 The *Brady* claim presents a close question. Before the trial, the State provided the defense a police report, and although the police report did not say outright that the 15 substances were commingled at the scene of the raid, it contained strong hints to that effect.

¶ 5    It is unnecessary to decide whether those hints amounted to an adequate disclosure under *Brady* (the prosecutor remarked that he, too, was surprised when the police officer testified to the commingling). Even without such hints, trial counsel should have investigated whether the substance in each of the 15 bags was separately tested, since the weight of the illegal substance was an essential element of the State's case and, according to case law, the powder in each separate container had to be tested. Trial counsel omitted to perform this investigation, and there was a reasonable probability that, but for the omission, defendant would have been convicted of possessing only "15 grams or more but less than 100 grams of a substance containing cocaine," an offense punishable by imprisonment for not less than 6 years and not more than 30 years (720 ILCS 570/401(a)(2)(A) (West 2006)), instead of being convicted of possessing "900 grams or more of any substance containing cocaine," an offense punishable by imprisonment for not less than 15 years and not more than 60 years (720 ILCS 570/401(a)(2)(D) (West 2006)). Also, there is a reasonable probability that the total amount of fines would have been less.

¶ 6    In short, we find ineffective assistance of counsel, a finding that makes it unnecessary for us to address the *Brady* claim. There is no reasonable probability that defendant would have been completely acquitted but for this ineffective assistance. Instead, the injury he suffered was being convicted of possessing "900 grams or more of any substance containing cocaine" (720 ILCS 570/401(a)(2)(D) (West 2006)) rather than being convicted of possessing "15 grams or more but less than 100 grams of a substance containing cocaine" (720 ILCS 570/401(a)(2)(A) (West 2006)). Therefore, we reverse the trial court's judgment, and we remand this case with directions to resentence defendant for a violation of section 401(a)(2)(A) of the Illinois Controlled Substances Act (720 ILCS 570/401(a)(2)(A) (West 2006) ("15 grams or more but less than 100 grams")).

¶ 7                                         I. BACKGROUND
¶ 8                                         A. The Jury Trial
¶ 9                              1. *Persons Immediately Arrested in the Raid*
¶ 10    In the jury trial, which was held in September 2007, the State adduced the following evidence.

¶ 11    Zundra Cotton lived at 353 North 18th Street, in Decatur, with her three sons and Genaro Hendrix. On March 22, 2006, police officers raided her house.

¶ 12    Defendant was standing on the steps of the front porch, and they arrested him. They searched his person and found he had a key to the front door of the house.

¶ 13    The police also arrested defendant's brother, Jimmie Lester, who was hiding in the back of a vehicle parked in front of the house. Under a seat in the vehicle, the police found $16,970 in a plastic bag.

¶ 14    Police officers also arrested Deeandre Woodland as he ran from the house. They retrieved a pistol he dropped while fleeing, and they found $1,020 in cash on his person.

¶ 15                          2. *What the Police Found Inside Cotton's House*
¶ 16    In the kitchen of Cotton's house, the police found a box of plastic Baggies, pieces of Baggies in a garbage can, and a set of digital scales with chunky white residue on them. Cotton's purse was on the kitchen table, and inside her purse were 15 bags of white powder.

Two black plastic bags were crumpled up on the table, near the purse, and defendant's fingerprints were on both of the black plastic bags. Inside the black plastic bags was a clear plastic wrapper with white residue on it.

¶ 17 A detective, Edward Root, who had participated in the raid, testified that the clear plastic wrapper was "consistent with the appearance of packaging for a kilogram of cocaine." The assistant public defender, Scott Rueter, asked Root:

"Q. All right. And so, it's just that in your experience is similar to a wrapping that goes around a kilo of cocaine?

A. Yes.

Q. All right. Now, a kilo of cocaine is how much?

A. It's one thousand grams or 2.2 pounds.

Q. All right. And what size would this package be normally when wrapped in this plastic?

A. Somewhere in the neighborhood of 8 to 9 inches long by anywhere 5 to 6 inches wide. It depends on how it's been compacted and anywhere maybe between an inch to an inch and a half thick.

Q. How well would something that size fit into a baggie, this plastic bag of this size?

A. It would be tight fit, but I believe it would fit, but it would be tight.

Q. Was there anything that you saw that day other than the fact that the clear plastic was found inside those black bags, was there anything that you collected that would indicate that those plastic bags had been around the kilo of cocaine when it was compressed in the clear plastic container?

A. Just the proximity which was again, 15 to 18 inches away from the purse.

Q. All right. And it's clear from what was going on there that somebody had taken the cocaine from this clear plastic wrapper and broke it down and put it into several smaller plastic bags which were in the purse. Correct?

A. That's what it appeared to be. Yes.

Q. Okay. And was there any physical evidence to tell you that day who had gone through that process?

A. Not that I'm aware of."

¶ 18 On redirect examination, Root explained that whenever cocaine was "in a kilo package," it was in the form of "powder" and it was "compacted tightly" within the plastic wrapper so as to resemble "a brick type object." A common way to compact cocaine was to put it in a trash compactor. When a kilogram package such as this was opened, it popped or exploded a little from being under pressure. In this instance, the wrapper already was open when the police arrived.

¶ 19 3. *Cotton's Testimony*

¶ 20 Although Cotton had no deal with the State, she admitted the only reason she was testifying against defendant was that she herself had been charged with unlawful possession of a controlled substance with the intent to deliver it and she had been told the prosecutors would

take her cooperation into account. She had lacked the funds to post bond, but she was released on her own recognizance when she agreed to testify against defendant.

¶ 21 Cotton testified that her child's father, Hendrix, was a drug dealer and that defendant, who lived in Chicago, had been his supplier. She had given defendant a key to her house, and she was present on 8 or 10 occasions when he delivered cocaine to her house. After defendant brought the cocaine from Chicago, he and Hendrix would divide it up into smaller bags. Often, Cotton would help with putting the individual portions of cocaine into Baggies and tying the Baggies.

¶ 22 On March 22, 2006, the morning before the raid, defendant telephoned Cotton. The State's Attorney, Jay Scott, asked her:

"Q. And what was the nature of that call?

A. He was coming over that morning because he suppose to got a package in that night.

Q. Was there any conversation about package?

A. No. He just asked me was Genaro there and I said, yes.

Q. Had there been previous conversations–you mentioned a package by package–

A. Yeah. The night before. Yeah.

Q. The night before–

A. The night before. Yes.

Q. Before the police came?

A. Yes.

Q. And you had a conversation with defendant?

A. Yes. Me, him, and Genaro. And he said his brother was bringing the crack cocaine up that night?"

(The final question mark, in the quotation above, appears in the original.)

¶ 23 Scott asked Cotton:

"Q. All right. The day then of the search warrant what was first contact you had with the defendant?

A. When he came, he came over that morning and he was there and I was cleaning up, you know, as far as the drugs, he was already in the kitchen bagging the drugs up.

Q. Were you at home when he got there?

A. Yes.

Q. And you said you were cleaning?

A. Yes. I was cleaning my house.

* * *

Q. So, the first time you laid eyes on the defendant that day, where was he and what was he doing?

A. When he came that morning he wasn't really doing anything. He just was telling me to call Genaro and I was study [*sic*] cleaning up. You know, he wasn't really doing anything.

* * *

Q. Did you ever see him doing anything else there at the house, doing something there at the house?

A. Yes. He was bagging up crack cocaine.

Q. And where was he doing that?

A. In the kitchen.

Q. Did you see how much cocaine was present?

A. It was a lot. It was a lot on the table, you know, but when I went in there, when he called me in there he was already having–it was already some was already bagged.

Q. Did you see where the cocaine was coming from, what kind of container it was in?

A. No, I didn't see.

Q. You say he called you in there?

A. In the kitchen.

Q. And what did he say to you at that point?

A. He told me to come help him bag up the crack cocaine.

Q. And did you then do that?

A. Yes.

Q. And by bagging it up, what was the defendant doing, and what were you doing?

A. He was breaking it up and putting on a scale weighing it. As he weighed it I took it off the scale, poured it in a bag, and tied it.

Q. Did you end up bagging all the cocaine that you saw there in the kitchen?

A. Yes. Yes.

Q. What then was done with the separate bags of cocaine?

A. He told me to find a bag, but I didn't have any in my house so, I went and got an old purse out my closet and put it in the purse.

Q. And where did you put the purse?

A. I left it on the table."

¶ 24    Cotton testified that, at the time of the raid, she was taking care of defendants' two puppies at her house. She denied, however, that defendant had given her plastic bags with which to pick up dog feces. "I don't go behind the dogs and pick up poop," she remarked.

¶ 25                              4. *Stipulations*

¶ 26    The parties stipulated that a forensic scientist with the Illinois State Police, Michael Cravens, had "determine[d,] to a reasonable degree of scientific certainty[,] that the white powder in People's [e]xhibit N[o.] 2 was 926.0 grams of cocaine." The parties also stipulated that the "chunky white material" in People's exhibit No. 6, the residue from the digital scales, was less than 0.1 gram of cocaine.

¶ 27                        5. *The Testimony of David Dailey*

¶ 28    Immediately after reading those stipulations to the jury, the prosecutor called David Dailey, a detective with the Decatur police department. He testified he assisted in executing the

search warrant on March 22, 2006. According to his testimony, he went into the kitchen, looked inside the purse on the kitchen table, and saw therein "several plastic [B]aggies that contained a white powder substance." Near the purse was packaging, which, in his experience, resembled "packaging from a kilo of cocaine."

¶ 29    At the scene, Dailey weighed the 15 bags from the purse. Nine of the bags weighed 63 grams apiece, and the other six bags weighed 64 grams apiece. He field tested only 1 of the 15 bags: it was positive for cocaine.

¶ 30    The prosecutor asked Dailey:

"Q. What did you do with the white powder substance that was in those 15 bags?

A. In order to submit the plastic bags to the Illinois State Police Crime Lab for latent print analysis I cut open each plastic bag and put all the cocaine into a separate evidence bag, sealed it up, then took the plastic sandwich bag or plastic bags that the powder substance came out of and put it into a separate bag."

¶ 31    The evidence bag into which Dailey dumped the contents of the 15 bags was People's exhibit No. 2. Thus, after field testing only 1 of the 15 bags for the presence of cocaine, Dailey commingled the contents of the 15 bags: he emptied the 15 bags into a larger evidence bag, People's exhibit No. 2. He then sealed People's exhibit No. 2 and took it to the evidence vault, while sending the empty 15 Baggies (which were, more precisely, the cut-off corners of Baggies) to the crime laboratory for latent fingerprint analysis. Defendant's fingerprints were found only on the 2 black plastic bags, not on the clear plastic wrapper or on any of the 15 Baggies. Dailey subsequently sent People's exhibit No. 2 (the 926 grams of powder) and People's exhibit No. 6 (the 0.1 grams of residue from the scales) to the crime laboratory for chemical analysis.

¶ 32    As we said, both Dailey and Root described the substances in the 15 bags as "white powder." On the other hand, Cotton repeatedly described the cocaine defendant had brought from Chicago, and which they had divided up in her kitchen, as "crack cocaine." According to her testimony, even defendant, in conversations with her, called it "crack cocaine." "Crack" is "a hard, crystalline form of cocaine," not powder. The New Oxford American Dictionary 396 (2001).

¶ 33                          6. *Motion for a Directed Verdict*

¶ 34    When the State rested, Rueter objected to the admission of People's exhibit No. 2, and he moved for a directed verdict, because before commingling the 15 bags, Dailey field tested only 1 of the bags, which contained only 63 or 64 grams. Rueter argued there was no evidence that the other 14 bags contained any cocaine at all and therefore the State not only had failed to prove a sufficient chain of custody for the admission of People's exhibit No. 2 but the State also had failed to prove that defendant possessed 900 grams or more of a substance containing cocaine, as alleged in the charges.

¶ 35    The trial court overruled the objection and denied the motion for a directed verdict, for the parties had stipulated that "Cravens was able to determine[,] to a reasonable degree of scientific certainty[,] that the white powder in People's [e]xhibit N[o.] 2 was 926.0 grams of cocaine." In other words, if People's exhibit No. 2 were cocaine, as the parties had stipulated, then the substances in the 15 bags, of which People's exhibit No. 2 was composed, necessarily were cocaine as well.

## 7. *Evidence From the Defense*

Defendant took the stand and testified substantially as follows. He was employed by a title insurance company. His job was to research property records. He also was attending DeVry Institute, in Chicago.

A number of times, he had traveled from Chicago to Decatur to rendezvous with his girlfriend, Mary Hames. They would stay in a hotel. He visited her the night before the raid, and they stayed in the Ramada Inn.

On the occasion of this visit, defendant brought along his dogs, but the Ramada Inn would not allow dogs, so he took the dogs to Cotton's house. He knew Cotton and Hendrix through Cotton's brother. Cotton gave defendant a key to her house so he could pick up the dogs when he was ready to return to Chicago. He never before possessed a key to her house.

As for the black plastic bags, defendant testified they resembled the bags he had brought along to clean up after his dogs. According to him, he did not know how the clear plastic had gotten inside the black plastic bags, and he knew nothing about the 15 Baggies in Cotton's purse.

Hames testified that defendant was the father of her baby and that she had an intimate relationship with him from January to March 2006. During that period, they spent time together in the Ramada Inn in Decatur.

## 8. *An Order in Limine*

Before closing arguments, the State moved to prohibit the defense from making to the jury the argument the trial court previously rejected, namely, that because Dailey field tested only 1 of the 15 bags before commingling them, the State had failed to prove that defendant possessed 900 grams or more of a substance containing cocaine. The court granted the State's motion.

## 9. *The Verdicts and the Sentences*

The jury found defendant guilty of three offenses: unlawful possession of more than 900 grams of a substance containing cocaine with the intent to deliver it (720 ILCS 570/401(a)(2)(D) (West 2006)), unlawful delivery of more than 900 grams of a substance containing cocaine (720 ILCS 570/401(a)(2)(D) (West 2006)), and unlawful criminal drug conspiracy (720 ILCS 570/405.1 (West 2006)).

The trial court entered convictions on these verdicts, and in a subsequent hearing, the court sentenced defendant to concurrent terms of 25 years' imprisonment for each of the three offenses. The court also imposed upon him a fine in the amount of $1 million, a mandatory drug assessment in the amount of $3,000, a laboratory fee in the amount of $100, and a street value fine in the amount of $92,600.

## B. The Direct Appeal

On direct appeal, we vacated the conviction of unlawful possession of a controlled substance because it was an offense included in unlawful delivery, and we also vacated the conviction of unlawful criminal drug conspiracy because it was impermissible to convict a defendant of both the principal offense and the inchoate offense. *People v. Coleman*, 391 Ill.

App. 3d 963, 976-77 (2009). We let stand the conviction on count VIII, the count charging defendant with unlawful delivery of 900 grams or more of a substance containing cocaine.

¶ 49                                C. Postconviction Proceedings

¶ 50    Defendant afterward filed a petition for postconviction relief, which the trial court summarily dismissed. Defendant appealed, and we reversed the summary dismissal and remanded the case for further proceedings, holding that the petition presented arguable claims that defense counsel had rendered ineffective assistance by entering into the stipulation and that the State had violated due process by failing to reveal, before the stipulation, that Dailey had mixed the 15 bags together into People's exhibit No. 2. *People v. Coleman*, 2012 IL App (4th) 110463, ¶¶ 75-76.

¶ 51    On remand, the trial court appointed another assistant public defender, Steve Jones, to represent defendant. The State filed a motion to dismiss the postconviction petition, and the court denied the motion. Consequently, the proceeding advanced to the third stage.

¶ 52    In the third-stage evidentiary hearing, Jones informed the trial court that the defense would stand on the existing record.

¶ 53    The State called two witnesses: Dailey and Scott. Dailey testified that when the police entered Cotton's kitchen, the kilogram wrapper already was torn open and that, if intact, it would have been the size of a kilogram of cocaine, or about the size of a book. He also testified that although there had been white residue on the kilogram wrapper, he had not requested the laboratory to test that residue.

¶ 54    Scott testified that, before Dailey's testimony in the jury trial, he was unaware that Dailey had mixed the contents of the 15 bags together at the scene. Like Rueter, Scott first learned that fact from Dailey's testimony.

¶ 55    The State presented People's exhibit No. 1, a copy of the police report that Scott provided to Rueter before the jury trial. Describing an exhibit labeled "C145805," the report read:

> "This exhibit consists of approximately 950 grams of a substance which field tested positive for cocaine. This exhibit was located by Detective E. Root in the previously mentioned black purse. This exhibit was later determined to be in fifteen (15) individually wrapped plastic bags. This exhibit was weighed with the packaging and six of the bags weighed approximately 64 grams while the other nine were approximately 63 grams. A photo was taken of this exhibit while it was inside the purse in the kitchen. The packaging was separated from this exhibit and will be submitted under a different evidence tag. This exhibit was later secured into a [Decatur police department] evidence locker and will be sent to the [Illinois State Police] Crime Lab for substance testing."

¶ 56    People's exhibit No. 1 also included a letter from Cravens to the Decatur police department. In his letter, Cravens acknowledged receipt of two items: (1) 926 grams of white powder and (2) 0.1 grams of white powder.

¶ 57    People's exhibit No. 2, the 926 grams, never was tested for purity. Both Dailey and Scott testified that the crime laboratory did not test substances for purity. Generally, there was no need to test for purity, because the State had only to prove that the substance in question contained a controlled substance; the ratio of the controlled substance to other ingredients typically was irrelevant, since, under statutory law, the seriousness of the offense depended not

on the amount of the controlled substance but, rather, on the amount of the substance containing the controlled substance. Scott admitted that if 14 bags containing no cocaine were mixed with 1 bag containing cocaine, the crime laboratory would find that the entire substance was a substance containing cocaine.

¶ 58   On November 7, 2013, after hearing this evidence in the third-stage hearing, the trial court denied the petition for postconviction relief. The court held that the defense had failed to establish a violation of due process (or, in other words, a violation of *Brady*) because Scott's testimony was uncontradicted that, before trial, he turned over to Rueter all the information he had regarding the powder in the 15 bags. But see *United States v. Bagley*, 473 U.S. 667, 676 (1985) (*Brady* also applies to exculpatory information known only to the police and not to the prosecutor).

¶ 59   As for the other claim, which alleged that entering into the stipulation amounted to ineffective assistance by Rueter, the trial court found the element of prejudice to be unproved because Cotton had testified that she and defendant took "the larger piece of cocaine, broke it into 15 smaller pieces, and put those pieces in 15 separate [B]aggies[,] which were placed in her purse on the kitchen counter" (we are quoting the trial court). The court said that "[a]lthough [Cotton] couldn't testify as to what the specific wrapping of container looked like from which the larger piece of cocaine [had come], she did testify that it was all from the same place."

¶ 60                                     II. ANALYSIS
¶ 61                          A. Our Hybrid Standard of Review
¶ 62   The parties assume our standard of review is purely deferential. Defendant cites *People v. Coleman*, 2013 IL 113307, ¶ 98, for the blanket proposition that "[t]he reviewing court evaluates the circuit court's decision to grant or deny postconviction relief following an evidentiary hearing for manifest error."

¶ 63   *Coleman*, however, scrutinized a claim of actual innocence, not a claim of ineffective assistance. *Id.* ¶¶ 49, 98.

¶ 64   The case the State cites, *People v. English*, 2013 IL 112890, ¶ 24, is equally inapposite because it applied not a deferential standard of review but a *de novo* standard of review to the third-stage denial of postconviction relief.

¶ 65   Granted, in *English*, the supreme court seemed to imply that if the judge who denied postconviction relief in the third stage were the same judge who had presided over the trial, the denial might deserve a more deferential standard of review. The supreme court said:

> "At the third stage-hearing in this case, the circuit court heard no new evidence; instead, the court reviewed the trial transcripts and heard arguments of counsel. In addition, the judge presiding over the hearing did not preside over [the] defendant's trial and, thus, had no special expertise or familiarity with the defendant's trial. Under these circumstances, the standard of review is *de novo*." *Id.*

Normally, though, the only time the trial judge's " 'special expertise or familiarity' with the [defendant's] trial" deserves deference on appeal is when "fact-finding and credibility determinations [were] involved." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006); see also *People v. Jacobazzi*, 398 Ill. App. 3d 890, 912 (2009) ("This deferential standard is appropriate because the trial court is in the best position to observe and weigh the credibility of the

witnesses."). It would be implausible to interpret *English* as prescribing, across the board, a purely deferential standard of review for claims of ineffective assistance whenever the judge who presided over the third-stage hearing was the same judge who had presided over the trial, because that interpretation would clash with *Strickland v. Washington*, 466 U.S. 668 (1984)–and in *English*, the supreme court reiterated its adoption of *Strickland* (*English*, 2013 IL 112890, ¶ 33).

¶ 66 In *Strickland*, the Supreme Court held that "[i]neffectiveness [was] not a question of basic, primary, or historical fact" but, rather, "both the performance and prejudice components of the ineffectiveness inquiry [were] mixed questions of law and fact." (Internal quotation marks omitted.) *Strickland*, 466 U.S. at 698. In reliance on that discussion in *Strickland*, the appellate court repeatedly has held that claims of ineffective assistance call for a hybrid standard of review:

> "Whether counsel provided ineffective assistance is a mixed question of fact and law. [Citation.] Therefore, we defer to the trial court's findings of fact, but we make an independent judgment about the ultimate legal issue. [Citation.] We review *de novo* whether counsel's omission supports an ineffective assistance claim. [Citation.]" *People v. Davis*, 353 Ill. App. 3d 790, 794 (2004).

See also *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 130; *People v. Westmoreland*, 2013 IL App (2d) 120082, ¶ 27; *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008).

¶ 67 In the present case, all the facts relevant to defendant's claim of ineffective assistance are undisputed. Therefore, we are left with a question of law: do the undisputed facts merit a legal conclusion that trial counsel rendered ineffective assistance?

¶ 68                              B. The Claim of Ineffective Assistance
¶ 69                                  1. *Deficient Performance*
¶ 70 A claim of ineffective assistance of counsel has two elements: (1) counsel's performance fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced defendant. *Strickland*, 466 U.S. at 687.

¶ 71 According to defendant, it was professionally unreasonable of trial counsel to enter into the stipulation. Defendant reasons as follows. The stipulation was that Cravens "had determine[d,] to a reasonable degree of scientific certainty[,] that the white powder in People's [e]xhibit N[o.] 2 was 926.0 grams of cocaine." Although the stipulation did not say "pure cocaine," "cocaine" is cocaine, not cocaine plus something else, and the trial court interpreted the stipulation at face value, as meaning that People's exhibit No. 2 consisted of nothing but "cocaine," 926 grams of it. We at least implicitly endorsed this interpretation on direct appeal when we said: "If, as the parties stipulated, all of the white powder in People's exhibit No. 2 was cocaine, it follows that all the white powder in the 15 bags was cocaine, for People's exhibit No. 2 consisted of the contents of the 15 bags." *Coleman*, 391 Ill. App. 3d at 973-74. Defendant argues that this stipulation, uninformed by any reasonable prior investigation, threw away a valuable, meritorious defense, a defense premised on the supreme court's decision in *People v. Jones*, 174 Ill. 2d 427 (1996).

¶ 72 In *Jones*, the police arrested the defendant for possessing "five separate packets," each of which contained "a white rocky substance," which the police suspected was cocaine. *Id.* at 428. The police, however, had only two of the five packets chemically tested. *Id.* The two

packets, together weighing 0.59 grams, were positive for cocaine. *Id.* The combined weight of all five packets–the two tested ones plus the three untested ones–was 1.4 grams. *Id.* The defendant was convicted of possessing, with the intent to deliver, 1.4 grams of a substance containing cocaine, a Class 1 felony (720 ILCS 570/401(c)(2) (West 1992)). *Jones*, 174 Ill. 2d at 428. The question on appeal was whether the defendant instead should have been convicted of possessing only 0.59 grams of a substance containing cocaine–a Class 2 felony (720 ILCS 570/401(d) (West 1992))–considering that the State had chemically tested only two bags, which weighed a total of 0.59 grams. *Jones*, 174 Ill. 2d at 428.

¶ 73    The supreme court began its analysis by noting that if a defendant were charged with possessing a specific amount of an illegal drug with the intent to deliver it and if there were a lesser included offense of possessing a smaller amount, the weight of the seized drug was an essential element of the offense, an element the State had to prove beyond a reasonable doubt. *Id.* at 428-29.

¶ 74    That did not mean the State had to chemically test each of 100 identically marked and stamped tablets that were all of the same color. In that circumstance, random testing would suffice. *Id.* at 429.

¶ 75    Powder, however, was different from pills. Obviously, when comparing multiple containers of powder, one could not say that this powder had the same markings, lettering, and beveling as that powder. In the case of powder, there were no symbols or visible structural designs on which to rely. Consequently, if the suspected contraband consisted of multiple containers of powdery substance, it was necessary to chemically test the substance in each and every container to prove, beyond a reasonable doubt, that the weight of the contraband the defendant possessed was the total weight of these multiple substances. *Id.* at 429-30.

¶ 76    The supreme court acknowledged it would be easy to *speculate* that the three untested packets in *Jones* contained cocaine, just like the two tested packets, but such a finding had to rest on evidence, not speculation. *Id.* at 430. Instead of containing cocaine, the three untested packets might have contained a look-alike substance. After all, the sale of look-alike substances, or pseudo narcotics, was common enough that the legislature had passed a statute criminalizing their sale (720 ILCS 570/404 (West 1992)). *Jones*, 174 Ill. 2d at 430. Having failed to chemically test the substance in each of the three packets, the State had failed to prove, beyond a reasonable doubt, that these substances actually were substances containing cocaine, and hence the State had proved no greater weight than 0.59 grams, the combined weight of the substances in the two tested packets. *Id.*

¶ 77    Defendant points out that likewise, in the present case, the State failed to chemically test each of the 15 substances in the 15 separate bags before commingling the 15 substances, thereby making separate testing impossible. He argues that because the crime laboratory did not test substances for purity, this commingling would have prevented the State from proving, beyond a reasonable doubt, that more than 1 of the 15 substances was a substance containing cocaine. According to him, the most one could reliably infer from the positive result Cravens obtained when testing the commingled powder is that 1 of the 15 bags, before the commingling, contained cocaine. The other 14 bags could have contained look-alike substances. The stipulation rescued the State from this problem, for if, as the stipulation said, Cravens had determined, to a reasonable degree of scientific certainty, that the commingled substances were "926.0 grams of cocaine," then each of the substances necessarily was cocaine before the substances were commingled. Defendant argues that, given the supreme court's

- 12 -

decision in *Jones*, which had been in existence for 10 years, trial counsel should have performed a reasonable investigation, confirming that the 15 bags were in fact separately tested, before entering into a stipulation that People's exhibit No. 2 was, according to scientific analysis, "926.0 grams of cocaine": a stipulation that was premature and, the way it was worded, factually unfounded (the 926 grams *contained* or *included* some amount of cocaine, perhaps a minuscule amount; it was not necessarily true that the 926 grams *were* cocaine).

¶ 78    "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Trial counsel in this case had a duty to make a reasonable investigation of the chemical testing. In light of *Jones*, an important part of that investigation was whether the 15 bags had been separately tested. Trial counsel had no reasonable basis for concluding that such an investigation was unnecessary. Nowhere does the police report say the 15 bags were separately tested. Rather, the police report contains hints of commingling. Not only does not the police report say the substances were separated from their original packaging, but in his letter to the police, Cravens acknowledges receipt of only two items: the undifferentiated 926 grams and the 0.1 grams. Therefore, while giving a "heavy measure of deference to counsel's judgments" (*id.*) and not allowing ourselves to be misled by the "distorting effects of hindsight" (*id.* at 689), we conclude that entering into the factually unfounded stipulation, together with failing to perform a reasonable investigation ahead of time, was "representation [that] fell below an objective standard of reasonableness" (*id.* at 687-88).

¶ 79                                                    2. *Prejudice*

¶ 80    A claim of ineffective assistance requires not only deficient performance but also resulting prejudice. See *id.* at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. This standard–an undermining of confidence in the outcome–is more generous than an "outcome-determinative standard," which would require a showing that "counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693.

¶ 81    For essentially two reasons, the State disputes there was a reasonable probability of a different outcome but for the stipulation. First, the State says that "[h]ad counsel not entered into the stipulation, the State would have called Cravens to testify to the information contained in the stipulation." But what exactly would Cravens have said on the stand–if he had been prompted to be scrupulously accurate in his wording? Would he have opined, to a reasonable degree of scientific certainty, that People's exhibit No. 2 was 926 grams of cocaine, or would he have opined, to a reasonable degree of scientific certainty, that People's exhibit No. 2 was 926 grams of a substance containing cocaine? Because the crime laboratory did not test substances for purity, the most he could have honestly said was that People's exhibit No. 2 was 926 grams of a substance containing some undetermined amount of cocaine. That testimony would not have resolved the question of whether more than 1 of the 15 bags contained cocaine.

¶ 82    Second, the State argues that, even without the stipulation, the jury would have inferred, from the evidence, that the 15 bags had come from what was apparently a kilogram wrapper on the table and that if these 15 substances had been broken off the same kilogram block, the

presence of cocaine in these commingled substances would inevitably lead to the conclusion that the kilogram block they formerly comprised was a substance containing some amount of cocaine.

¶ 83 The kilogram block, however, could have been comprised entirely of a look-alike substance, which could have gotten mixed up with preexisting cocaine residue on the scales when the kilogram block was broken up and weighed. Or an amount of cocaine from some other source could have been mixed in during the apportionment. Cotton did not witness all the bagging. Some of the bagging was already finished when she walked into the kitchen. It is true that the kilogram package had untested white powder residue on it, but recall that, under *Jones*, a trier of fact is not permitted to speculate that white powder in a package is cocaine just because the powder looks like cocaine, and just because the packaging looks like cocaine packaging, and just because an adjacent package contains a substance chemically confirmed to include cocaine, and just because the defendant is in the cocaine business. In short, to prove, beyond a reasonable doubt, that each of the 15 bags contained cocaine, there was no way around *Jones*'s requirement of chemically testing the contents of each bag–unless a stipulation freed the State from that requirement. That is what the stipulation did, and it was prejudicial to the defense.

¶ 84 Ineffective assistance of counsel is a violation of the sixth-amendment right to counsel (U.S. Const., amend. VI; *Strickland*, 466 U.S. at 686), and the remedy for a violation of the sixth amendment "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests" (*United States v. Morrison*, 449 U.S. 361, 364 (1981)). There is no reasonable probability that defendant would have been acquitted but for the ineffective assistance. Clearly, he was guilty of unlawfully possessing "15 grams or more but less than 100 grams of a substance containing cocaine," an offense punishable by imprisonment for not less than 6 years and not more than 30 years (720 ILCS 570/401(a)(2)(A) (West 2006)). The ineffective assistance has no bearing on that question. The positive result for the commingled substances proved that 1 of the 15 bags contained cocaine, and the bags weighed 63 or 64 grams apiece. But one can only speculate about the remaining 14 bags. After the commingling, it would have been impossible to prove, beyond a reasonable doubt, that they likewise contained cocaine.

¶ 85                                             III. CONCLUSION
¶ 86 For the foregoing reasons, we reverse the trial court's judgment and sentence, and we remand this case with directions to resentence defendant for a lesser included offense: a violation of section 401(a)(2)(A) of the Illinois Controlled Substances Act (720 ILCS 570/401(a)(2)(A) (West 2006)) ("15 grams or more but less than 100 grams").

¶ 87 Reversed; cause remanded with directions.