NOTICE
Decision filed 08/21/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220637-U

NO. 5-22-0637

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 19-CF-1482 |
| | ) | |
| DAKIR D. PICKENS, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justice Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: Following an evidentiary hearing, the circuit court did not err in denying both the defendant's amended postconviction petition and amended motion to withdraw guilty plea and vacate judgment, where the defendant did not demonstrate by a preponderance of the evidence that his defense counsel's performance fell below an objective standard of reasonableness.

¶ 2    Dakir D. Pickens, the defendant, filed an amended postconviction petition and claimed that his defense counsel was ineffective for failing to fully advise the defendant of the details of his plea agreement. The defendant also filed an amended motion to withdraw guilty plea and vacate the judgment, in which the defendant asserted that his decision to plead guilty was a result of ineffective assistance of counsel. After a hearing, the circuit court denied both the amended postconviction petition and the amended motion. The defendant appeals the circuit court's orders that denied his amended petition and amended motion. The defendant claims on appeal that the

1

circuit court erred when it refused to withdraw the defendant's guilty plea, where his attorney failed to advise him that the State's plea offer could be withdrawn at any time, and where the State withdrew the offer before the defendant had the opportunity to accept it. As a result of his counsel's conduct, the defendant claims he accepted a less favorable plea offer, which imposed a harsher sentence than he would have received had he been allowed to accept the State's previous plea offer. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4     The State charged the defendant by information with armed violence (720 ILCS 5/33A-3(b-5) (West 2018)), a Class X felony (count 1); armed violence (720 ILCS 5/33A-3(a) (West 2018)), a Class X felony (count 2); financial institution robbery (720 ILCS 5/17-10.6(f) (West 2018)), a Class 1 felony (count 3); and aggravated battery (720 ILCS 5/12-3.05(f)(1) (West 2018)), a Class 3 felony (count 4). The information alleged that "the defendant struck Eva Ku in the head repeatedly with a handgun" while he attempted to rob the Regions Bank in Champaign, Illinois. The circuit court appointed counsel to represent the defendant.

¶ 5     While the case was pending, the defendant personally corresponded with the circuit court on several occasions. On June 25, 2020, the defendant filed a *pro se* motion to dismiss counts 1 and 2. On July 9, 2020, the defendant filed a letter dated July 3, 2020, wherein the defendant requested a new attorney. He claimed that his attorney had not explained defendant's speedy trial rights, and that the defendant and his attorney had disagreements about which motions were appropriate to file. Specifically, defense counsel had informed the defendant that "if the motion does not have merit [he] will not file it." On July 14, 2020, the defendant filed a *pro se* motion to discharge, wherein he argued that the State failed to bring the defendant to trial before his speedy

2

trial period expired. In a letter filed on July 24, 2020, the defendant again asked for a new attorney because defense counsel would not adopt the *pro se* motion to dismiss counts 1 and 2.

¶ 6     At a hearing on July 21, 2020, the defendant requested that he be allowed to represent himself. The circuit court admonished the defendant pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984). After further consideration, the defendant decided to remain represented by his defense counsel. Subsequently, on August 13, 2020, the defendant again requested a new attorney in a letter filed with the circuit court.

¶ 7     A plea hearing occurred on September 23, 2020. The circuit court admonished the defendant of his rights pursuant to Illinois Supreme Court Rule 402(a) (eff. July 1, 2012). The defendant indicated to the trial court that he understood he was present in court to plead guilty to count 2, armed violence. The circuit court advised the defendant of the sentencing range and that he may be required to serve 85% of his sentence. The defendant confirmed he understood his rights and that he was voluntarily pleading guilty. The prosecutor indicated that the State had agreed to cap any recommendation for incarceration at 23 years and that the court would determine whether the defendant's conduct leading to the offense caused great bodily harm to the victim, Eva Ku. If the court found that the defendant caused great bodily harm, he would be required to serve no less than 85% of his sentence. Defense counsel added that absent a finding of great bodily harm, the defendant would be required to serve 50% of his sentence.

¶ 8     The State then provided a factual basis for the charge. On October 15, 2019, two individuals entered a Regions Bank in Champaign, Illinois. The first suspect, now known to be the defendant, wore a blue hoodie and carried a loaded firearm. The second suspect, now known to be Dasheem Pickens, was the defendant's brother. Both suspects wore hats and glasses to conceal their

3

identities. The defendant grabbed Ku, the bank manager, by her hair, brandished a firearm, and demanded money. Dasheem attempted to apprehend a second bank employee.

¶ 9    Ku refused to give the suspects access to the locked teller area where other employees were hiding. The defendant hit Ku in the head repeatedly with his weapon. The defendant kicked the glass wall, leaving a shoe print. Unable to access the locked area, the suspects then fled the bank. The incident was captured on surveillance video.

¶ 10    A postal employee observed the suspects flee the bank and turn into an alley. The suspects returned from the alley wearing different clothes. The postal employee provided a description of the two suspects.

¶ 11    When the police arrived at the bank, they found Ku bleeding from a wound on her head. The police located the suspects in the area of the bank. After a foot chase, both suspects were apprehended and taken into custody. The postal employee identified the suspects, and their appearance was consistent with the bank surveillance video. When the defendant was taken into custody, he was wearing different shoes than when he kicked the glass in the bank. The two suspects had apparently traded shoes. The police found the sweatshirt worn by the defendant with a loaded .22-caliber firearm in the alley where the individuals had changed clothes.

¶ 12    When officers advised the defendant they would be taking "GSR" (gunshot residue) samples, the defendant attempted to spit on his hands. The defendant also stated that he should have urinated on his hands to prevent the State from recovering any possible gunshot residue on his hands. At a later date, with counsel present, the defendant made a recorded statement admitting his role in the offense.

¶ 13    Following the State's factual basis, the defendant pled guilty to armed violence. The circuit court found that the guilty plea was made knowingly, understandingly, and voluntarily. The circuit court also found that there was a factual basis for the plea and accepted the plea.

¶ 14    The sentencing hearing was held on November 17, 2020, and November 18, 2020. During the hearing on November 17, 2020, evidence was presented regarding whether the defendant caused great bodily harm to the victim. The State first presented the circuit court with its legal memorandum describing when injuries constitute great bodily harm. The circuit court confirmed that it had received a copy of the victim impact statement and various pages of Detective Cherry's police report. The State then called its first witness.

¶ 15    The State's first witness was Dr. James R. DeSalvio. The parties stipulated that Dr. DeSalvio was an expert in the field of physical medicine. Dr. DeSalvio was one of Ku's treating physicians. Dr. DeSalvio testified that the victim had presented with a head injury and symptoms of a concussion. Dr. DeSalvio testified that being struck in the head with a pistol would have caused the laceration on her scalp and the concussion. The symptoms of the concussion Ku experienced included difficulty concentrating, sensitivity to light, headaches, ringing in her ears, and loss of balance. Dr. DeSalvio testified that the victim's concussion was a serious condition because her symptoms persisted from the incident and were still present at the time of the sentencing hearing, nearly a year later. Dr. DeSalvio stated that the victim's symptoms have had a very profound effect on her day-to-day life. In addition, Dr. DeSalvio testified that the victim had various musculoskeletal injuries and a significant amount of mental distress and trauma from the incident. The victim's musculoskeletal injuries caused pain in the muscles of the cervical spine, the neck area, and particularly the low back. Her pain made it difficult to perform daily life activities, such as getting up, walking, showering, and housework. The musculoskeletal issues

have also persisted and were present at the time of the sentencing hearing. Dr. DeSalvio stated that his notes reflect the most serious issues the patient presented with at the time, and the issues impacting the patient most may shift over the course of treatment.

¶ 16    During cross-examination, Dr. DeSalvio acknowledged that the laceration on the victim's head was only two centimeters long. Dr. DeSalvio also testified on cross-examination that his notes from an early appointment with the victim did not mention musculoskeletal pain. In notes from April 24, 2020, Dr. DeSalvio stated that the "patient is continuing to struggle more from a mental health point of view than from a musculoskeletal point of view.

¶ 17    Detective Jody Cherry of the Champaign Police Department testified next for the State. Detective Cherry was one of the responding officers to the bank robbery and was the assigned case agent. While Detective Cherry testified, a video of the robbery was introduced into evidence. As the video was played, Detective Cherry narrated various portions. Detective Cherry also testified that six shell casings and one live round were discovered throughout the bank. The defendant had fired one shot into the ceiling of the breakroom, one shot at the teller station door, and four into the bulletproof glass. The defendant also kicked the bulletproof glass. Detective Cherry testified that prior to the bank robbery a third party used the defendant's phone to call 911 to report "shots fired" on the opposite side of Champaign. The 911 call caused several squad cars to be dispatched to the opposite side of Champaign to address the "shots fired" call. Detective Cherry stated that they had also located the clothing worn by the defendant and his brother during the robbery and had recovered a weapon. Once the individuals were in custody, police backtracked to where the individuals had been seen. Through that investigation the police found the firearm buried in a pile of rocks near an apartment building.

6

¶ 18    Eva Ku, the victim, testified about the attack and how it had impacted her. Before the robbery, Ku was about to have lunch. Ku went to the breakroom to get a plastic spoon when she heard a gunshot. The defendant approached her, grabbed her hair, threw her to the ground, and hit her on her head with a gun. The defendant demanded that she give him the money and access to the teller area. Ku was in shock and remained on the ground trying to protect her head. After the gunmen left, Ku went to the emergency room. She was bleeding profusely from her head, and she received four staples to treat her wound. Ku returned to the emergency room the next day because she had extreme pain in her head.

¶ 19    Ku described her recovery since the incident. She testified she had migraines every day because of the head injury. Ku's migraines also caused nausea. Due to the severity of Ku's migraines, Ku's mother helped care for Ku's two children. Ku also had an issue with her balance and ringing in her left ear. In addition, Ku experienced pain in her neck, shoulder, and lower back. Pain bothered her daily. Ku was still participating in physical therapy at the time of trial. As a result of her injuries, Ku was unable to return to work or pursue a master's degree. The injuries prevented Ku from being able to look at screens for more than a half hour, otherwise she would get a headache, eye pain, dizziness, and nausea.

¶ 20    The State also presented the testimony of Erika Ecker, who worked as a teller at the time of the robbery. Ecker testified about her experience during the robbery. She was behind the glass wall that the defendant shot at when he tried to access the money at the bank. Ecker still worked at the bank, but the robbery made her nervous and she no longer goes places by herself. That testimony concluded the State's evidence.

¶ 21    Defense counsel presented two witnesses in mitigation. Greg Jahiel, a social worker from the "READY Program," testified that he knew the defendant from when he attended the alternative

7

high school for the 2016 to 2017 school year. Jahiel testified that the defendant was polite and did well in school when he was present. Any issues that Jahiel had noticed were related to the defendant's attendance. April Whitney, a teacher from the "READY Program," also testified. Whitney also knew the defendant when he attended the alternative school. Whitney recalled the defendant as "a very gentle young man who wanted to do well."

¶ 22    The sentencing hearing continued on November 18, 2020. The State recommended that the defendant serve 23 years in the Illinois Department of Corrections and that the circuit court find that the defendant's conduct caused great bodily harm to Ku. Defense counsel argued that there were not sufficient facts presented to prove great bodily harm. Defense counsel recommended that the defendant be sentenced to 15 years, that the circuit court not make a finding of great bodily harm, and that the defendant receive substance abuse treatment while incarcerated. The circuit court sentenced the defendant to 19 years of imprisonment. The circuit court found that the State proved that the defendant's actions caused great bodily harm, and, therefore, his sentence would be served at 85%.

¶ 23    On December 17, 2020, defense counsel filed a motion to reconsider sentence that argued the circuit court improperly considered the firearm to find great bodily harm where the use of the firearm is included within the definition of the offense. On February 4, 2021, the circuit court denied the motion. The defendant appealed.

¶ 24    While the appeal was pending, the defendant filed a *pro se* postconviction petition. The defendant alleged in his petition that in May 2020, assistant State's Attorney Lozar had extended a plea offer for an open plea to count 2 for 15-20 years to be served at 50%. The defendant expressed to his counsel that he wanted to accept the plea offer. His defense counsel responded,

"No I'm going to give you a day to think about it." The plea offer was retracted the following day. The defendant's petition was advanced to the second stage with a public defender to be appointed.

¶ 25    In the meantime, the appellate court remanded the defendant's appeal to the circuit court to comply with the requirements of Illinois Supreme Court Rule 604(d) (eff. July 1, 2017). Upon remand, the defendant's new attorney, Horwick, filed a 604(d) certificate and an amended motion to withdraw guilty plea and vacate the judgment. The amended motion argued that defense counsel had provided ineffective assistance because he told the defendant not to accept the State's plea offer where defendant would be allowed to plead guilty to count 3 with a sentencing cap of 20 years on the day the offer was made. Further, defense counsel did not advise the defendant that there was an expiration date on the plea offer, and the following day the State revoked the offer. If the defendant had known that the offer would be revoked the next day, he would have accepted the offer.

¶ 26    On March 7, 2022, the defendant's postconviction counsel, Horwick, filed an amended postconviction petition.[1] The amended petition also alleged an ineffective assistance of counsel claim but changed the date and terms of the plea offer. It alleged that defense counsel had informed the defendant about an offer to plead guilty to count 2 with a sentencing cap of 20 years, which would be served at 50%. It further alleged that the defendant wanted to accept the offer, but his defense counsel told him to think about it for a day. The following day the defendant was informed that the offer was no longer available. The amended petition argued that defense counsel was ineffective because he did not fully advise the defendant regarding the details of the plea agreement, including that the offer would expire.

---

[1]Attorney Horwick was appointed to represent the defendant on the postconviction petition and the motion to withdraw guilty plea and vacate judgment.

¶ 27     On September 23, 2022, the circuit court held a hearing on the amended motion to withdraw guilty plea and vacate judgment and the amended petition for postconviction relief. The defendant's counsel, Horwick, was present at the hearing and represented the defendant on his amended motion to withdraw guilty plea and vacate judgment and amended postconviction petition. Defense counsel called the defendant as the first witness. The defendant testified that he spoke with his plea counsel[2] on August 6, 2020, but his memory of the conversation was "kind of blurry." During the conversation the defendant and his attorney discussed a plea offer that had been made by the State. The plea offer was a minimum 15 years with a cap of 20 years, which would be served at 50%. The defendant stated that he wanted to accept the plea offer the same day it was made, but his defense counsel advised him to "think about it." The defendant's counsel admitted a letter from plea counsel dated August 7, 2020, which detailed the plea negotiations. The defendant reiterated that his memory was "a little blurry." He thought he spoke to his plea counsel the day after the plea offer was conveyed and told his plea counsel that he still wanted to accept the offer. Plea counsel then informed the defendant that the offer had been revoked. The defendant testified that he would have accepted the offer immediately had his plea counsel not told him to wait.

¶ 28     On cross-examination, the defendant testified that he believed that the entire initial conversation regarding the plea offer occurred on August 6, 2020. The defendant testified that he did not express any hesitation when he told his plea counsel that he wanted to accept the offer. The defendant also testified that his plea counsel did not tell him that the offer could be revoked. The defendant's testimony was the only evidence presented by defense counsel.

---

[2]The attorney that represented the defendant prior to and at the time of the defendant's plea is hereafter referred to as "plea counsel."

¶ 29    The State then called the defendant's plea counsel as a witness. Plea counsel explained that he had been assigned to represent the defendant in a case involving a bank robbery. After a review of the evidence, he believed that the case against the defendant was "fairly strong," in part because the defendant was found near the bank shortly after the incident, portions of the robbery were captured on surveillance video, and the defendant made incriminating statements about gunshot residue.

¶ 30    The first plea offer was for the defendant to plead guilty to count 1, armed violence while discharging a firearm, with a sentencing range of 20 to 30 years, to be served at 50%. Plea counsel thought the defendant would serve 50% because his review of the statute and the police reports did not reveal any evidence of great bodily harm. During the first meeting, the defendant indicated that he wanted to cooperate with the State and implicate another person who had provided the guns and the plan to rob the bank. The defendant was not able to produce enough corroboration to support the defendant's attestations. As a result, the defendant's priority became negotiating a better resolution.

¶ 31    The State then presented plea counsel with email correspondence regarding a plea offer made by the State on June 16, 2020. The State's offer was an "open cap of 20 [years] on count two, armed violence." The sentencing range for count two would be 15 to 20 years. At that time, plea counsel still believed that the sentence would be served at 50%. He relayed this offer to the defendant the same day. Plea counsel testified that the defendant was not enthusiastic about the offer. The defendant expressed he wanted 15 years pursuant to a previous offer that plea counsel had proposed to the State. Plea counsel indicated that he "thought it was a fairly good offer with all the facts consider[ed] in the case," including that the defendant could not produce evidence about the third-party involvement and the defendant might still get 15 years. Plea counsel testified

11

that the defendant did not accept or reject the State's offer. At the end of the conversation, plea counsel testified that he told the defendant to think about the offer. Plea counsel testified that he would often give indecisive clients time to consider their decision because he did not want to pressure a client. Since there was no expiration date on the offer, plea counsel did not inform the defendant that the offer could be revoked. Plea counsel, on the same day, sent an email to the assistant State's attorney, Lozar, indicating plea counsel had relayed the plea offer to the defendant, and "will let you know what he says." The following day, plea counsel received an email from the State that retracted the offer. The email was admitted into evidence and plea counsel read the email into the record. In the email, the State's attorney apologized for retracting the offer, which he rarely did, but after he had spoken with the victim, he learned that the victim's injuries and long-term effects from the incident were more severe than initially related to him. The State needed to decide whether the offer was still appropriate and if the injuries constituted great bodily harm. Plea counsel testified that on the same day as receiving the email, he informed the defendant that the State had retracted the offer. The defendant was not happy because he thought he would have to serve 50%, not 85% of his sentence.

¶ 32    After the plea offer was retracted, the defendant indicated that he wanted to represent himself because plea counsel would not file certain motions the defendant believed were relevant to the case. Plea counsel and the defendant disagreed about the strength of the motions requested by the defendant. Plea counsel testified that the defendant did not mention the retracted offer during his conversations with the defendant or in the circuit court filings made by the defendant. After plea counsel reviewed the medical records for the victim, he asked the State to re-extend its offer. The State declined. Plea negotiations continued until the defendant accepted an offer of an open plea with a cap of 23 years, the dismissal of a misdemeanor, and the circuit court would make the

determination of whether there was great bodily harm to the victim. Plea counsel also testified that a plea would not have been executed the day an agreement was made, especially when the agreement occurred later in the day, as it was in this case. It could have been arranged for the next day if the jail had been willing to bring the defendant to court.

¶ 33 On cross-examination, plea counsel testified that he typically had 50 clients at a time, but the number of clients varied between 40 and 60. Plea counsel also confirmed that the defendant did not accept the State's offer and plea counsel had given the defendant time to think about it. Further, plea counsel did not have the opportunity to speak with the defendant the following day regarding the offer because the defendant did not have court scheduled. Plea counsel's testimony concluded the State's evidence.

¶ 34 The defendant's postconviction counsel argued that the defendant received ineffective representation because plea counsel told the defendant to take some time to think about the offer and the defendant listened to his counsel's advice. If the defendant had accepted the offer immediately, there would have been a chance that the outcome would have been different because the defendant would be serving 50% instead of 85% of his sentence.

¶ 35 The State then argued that the circuit court did not have jurisdiction over the motion to withdraw guilty plea because it was not timely. The State argued that plea counsel was not ineffective because he believed that this offense would be served at 50% because great bodily harm was not alleged by the State until the offer was retracted. The State also argued that plea counsel was not ineffective when he failed to convey that the offer could be retracted because there was no suggestion that there was a deadline on the offer, and it was rare for the State to retract an offer. The dispute whether the defendant accepted the offer was a credibility determination for the court to make, but the defendant had not complained about it in any of his previous *pro se* filings with

the court. Alternatively, the State argued that if plea counsel acted unreasonably when he failed to immediately convey the defendant's acceptance of the offer, there had been no showing that the outcome would have been different.

¶ 36　After hearing evidence and argument from counsel on both the amended motion to withdraw plea and the amended postconviction petition, the circuit court found that plea counsel was credible and the defendant was "less credible." The circuit court then addressed whether plea counsel was ineffective. Based on the evidence presented at the hearing, the circuit court could not find that plea counsel was ineffective. Plea counsel had properly advised the defendant about the percentage of time to be served with the information he had at the time. There was no deadline on the offer, so plea counsel was not at fault for failing to declare a deadline. The circuit court considered the testimony, corroborating emails and letters presented, and found that the defendant did not accept the offer. As a result, plea counsel did nothing wrong by not conveying an acceptance of the offer. As a matter of law, the circuit court found that plea counsel's conduct did not fall below that of a reasonable attorney. The circuit court did not make a finding on whether there was prejudice to the defendant because it did not believe that plea counsel acted inappropriately. The circuit court denied the amended motion to withdraw guilty plea and the amended postconviction petition. This appeal followed.

¶ 37　　　　　　　　　　　　　　　II. ANALYSIS

¶ 38　On appeal, the defendant claims that the circuit court erred when it refused to withdraw the defendant's guilty plea, where his plea counsel failed to advise him that the State's plea offer could be withdrawn at any time, and where the State withdrew the plea offer before the defendant had the opportunity to accept it. Alternatively, the defendant argues that plea counsel could have attempted to secure more specific terms from the State, including a firm expiration date for its

14

offer. Before addressing the defendant's claim on the merits, we consider the State's claim of waiver.

¶ 39    The State argues that the defendant waived any alleged error because he pled guilty while fully aware of the circumstances of the earlier plea offer and its withdrawal. " 'It is well established that a voluntary guilty plea waives all non-jurisdictional errors or irregularities, including constitutional ones.' " *People v. Sophanavong*, 2020 IL 124337, ¶ 33 (quoting *People v. Townsell*, 209 Ill. 2d 543, 545 (2004)). Under the Post-Conviction Hearing Act, the State was required to file either an answer or motion to dismiss within 30 days from the date of the order allowing the second stage proceeding. 725 ILCS 5/122-5 (West 2020). "By its answer, a party either admits or denies the allegations contained in the complaint, thereby framing the issues to be resolved later by litigation. A motion to dismiss, on the other hand, attacks the sufficiency of the complaint." (Internal quotation marks omitted.) *People v. Thompson*, 2016 IL App (3d) 140586, ¶ 25. The State may forfeit a claim of waiver by failing to raise the issue before the circuit court. *People v. Behena*, 2020 IL App (1st) 180197, ¶ 29.

¶ 40    Here, during the second stage of the proceedings, the State filed an answer to the amended postconviction petition. The State did not argue that the defendant had waived his claim of ineffective assistance of defense counsel in its answer or at the evidentiary hearing. Therefore, we reject the State's contention of waiver.

¶ 41    We then turn to the merits of the defendant's appeal. The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a three-step process to resolve a criminal defendant's conviction or sentence that resulted from a violation of rights protected under the state or federal constitution. *People v. York*, 2016 IL App (5th) 130579, ¶ 15. "At the first stage of postconviction proceedings, the court reviews the petition to determine whether it is frivolous and

15

patently without merit." *York*, 2016 IL App (5th) 130579, ¶ 15. This review is undertaken independently, without input from the State. "To survive first-stage dismissal, the defendant need only assert the gist of a constitutional claim." *York*, 2016 IL App (5th) 130579, ¶ 15. If the circuit court does not dismiss the claim, the petition is docketed for further proceedings and counsel is appointed for the defendant. At the second stage, an amended petition may be filed by counsel, and the State may file a motion to dismiss or an answer. The defendant is required to make a "substantial showing of a constitutional violation" at the second stage. (Internal quotation marks omitted.) *York*, 2016 IL App (5th) 130579, ¶ 16. If the petition is not dismissed at the second stage, it advances to the third stage, where the court will hold an evidentiary hearing on the defendant's claims. *People v. Wallace*, 2018 IL App (5th) 140385, ¶ 27. The defendant has the burden to prove a substantial denial of a constitutional right by a preponderance of the evidence during the third stage. *People v. Coleman*, 2013 IL 113307, ¶ 92.

¶ 42    To prove ineffective assistance of counsel, the defendant must prove both (1) counsel's conduct fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defendant, and it is reasonably probable that the result would have been different but for counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). It is well settled that there is a strong presumption that counsel's conduct falls within the wide range of professional assistance. *People v. Crutchfield*, 2015 IL App (5th) 120371, ¶ 34. Whether to enter a plea is a decision that belongs to the defendant, not a decision that counsel may make as a part of trial strategy. *People v. Boyd*, 2018 IL App (5th) 140556, ¶ 17.

¶ 43    "[W]here a defendant pleads guilty to less favorable terms and claims that ineffective assistance of counsel caused him to miss out on a more favorable earlier plea offer, *Strickland*'s inquiry into whether 'the result of the proceeding would have been different,' 466 U.S., at 694,

requires looking not at whether the defendant would have proceeded to trial absent ineffective assistance but whether he would have accepted the offer to plead pursuant to the terms earlier proposed." *Missouri v. Frye*, 566 U.S. 134, 148 (2012). The defendant must also demonstrate a reasonable probability that the plea would have been entered into without the prosecution cancelling the plea or the circuit court rejecting the plea. *Frye*, 566 U.S. at 148.

¶ 44 If the defendant fails to satisfy either prong under *Strickland*, the claim will fail. *Boyd*, 2018 IL App (5th) 140556, ¶ 19. Where allegations of ineffective assistance of counsel survive to a third-stage hearing, we review the trial court's decision as a mixed question of fact and law. *People v. Coleman*, 2015 IL App (4th) 131045, ¶ 66. We accept the trial court's findings of fact so long as they are not against the manifest weight of the evidence. But we review whether the facts found by the trial court prove ineffective assistance of counsel *de novo*. *Coleman*, 2015 IL App (4th) 131045, ¶ 66. A finding is against the manifest weight of the evidence only if it contains error that is clearly evident, plain, and indisputable. *People v. Hughes*, 329 Ill. App. 3d 322, 325 (2002).

¶ 45 Here, the record shows that plea counsel relayed the details of the State's offer to the defendant the same day that it was made. Plea counsel did not mention that the offer could be retracted because the State did not include a deadline in its offer. Plea counsel testified that the defendant was not enthusiastic about the offer and that the defendant did not accept or reject the offer. Plea counsel testified that he believed that it was a favorable offer and suggested that the defendant take a day to consider it. Defendant, on the other hand, testified that he wanted to take the offer, but that his plea counsel advised him to "think about it."

¶ 46 The following day, the State's attorney emailed plea counsel to retract the offer. In the State's attorney's email, he noted that this was a rare occurrence, and he apologized for the

17

necessity to retract the offer in this case. The State's attorney indicated that the victim's injuries and long-term effects were more serious than initially related to him, so he needed to check whether the injuries would constitute great bodily harm, and whether the 15- to 20-year sentence was appropriate. Since no court had been scheduled on the day following the plea offer, plea counsel did not have the opportunity to follow up with his client before the State withdrew its offer.

¶ 47    The circuit court stated that there was no corroboration for what the defendant claimed occurred and there was corroboration for what plea counsel testified had occurred. As a result, the circuit court found that plea counsel's testimony was more credible than the defendant's testimony.

¶ 48    Based on the foregoing, plea counsel's conduct did not fall below an objective standard of reasonableness. Plea counsel promptly relayed the terms and conditions of the State's offer to the defendant, which did not include a deadline. When plea counsel presented the offer to the defendant, he was not enthusiastic about the offer and indicated that he wanted a previous offer declined by the State. As plea counsel often did with indecisive clients, he suggested that the defendant take a day to think about the offer. Allowing the defendant time to reflect was not unreasonable because whether to accept a plea offer is a decision only the defendant can make. *Boyd*, 2018 IL App (5th) 140556, ¶ 17. Further, the State's attorney's email acknowledged he "rarely" retracted offers. There was simply no indication that the offer would be retracted so quickly.

¶ 49    The defendant also argues that the circuit court made a factual finding that was manifestly erroneous when it concluded that the defendant told plea counsel "no, I don't want" the offer. When considering whether the defendant accepted the offer, the circuit court made the following statements:

18

"Defendant's the only one who says, yes, I wanted it, and it begs the question really of what stake does Mr. Ham[3] have in all this.

Mr. Ham has a lot of caseload, a heavy caseload. He's really, really busy. If he conveys an offer to a defendant and the defendant says, yes, I'll take it why in the world would Mr. Ham say no, you know what, why don't you sleep on it, why don't you think about it which then ultimately caused Mr. Lozar the next day to revoke the offer due to something totally unrelated. It seems to me that the Defendant very likely said, just as *** Mr. Ham said, he didn't want it. He wasn't enthusiastic about it. Mr. Ham likely told him I think this is a good offer and when the Defendant said, no, I don't want it, I'm not enthusiastic about it that's what caused Mr. Ham to say, you know what, think about it. I'll give you some time to think about [it] to see if you will, in fact, accept that offer. That's why he emailed the State after talking with Mr. Pickens to say I've relayed it to my client. I'll let you know what he says implying clearly that Mr. Pickens did not say, yes, I want it but, no, I don't want it, and Mr. Ham's the one who said let me buy you some time essentially.

So, the real issue is what did Mr. Pickens say to Mr. Ham, and I don't find based on the testimony here, as well as the corroboration of the emails and other letters, that he accepted the offer and therefore Mr. Ham did something wrong by not conveying it."

The full context of the court's statement demonstrates that the circuit court did not incorrectly remember plea counsel's testimony. Plea counsel testified that the defendant was not enthusiastic about the offer and did not accept or reject it. The circuit court commented that if the defendant had accepted the offer, plea counsel would have readily conveyed the defendant's acceptance due to defense counsel's heavy workload. Based on the testimony and corroboration of emails and letters, the circuit court found that the defendant did not accept the offer. Therefore, we find that the circuit court's finding is not against the manifest weight of the evidence.

¶ 50    The defendant has the burden to show a substantial denial of constitutional right by preponderance of the evidence. During a third stage postconviction hearing, the circuit court is "able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a

---

[3]The reference to Mr. Ham is plea counsel.

19

position of advantage in a search for the truth which is infinitely superior to that of a tribunal where the sole guide is the printed record." (Internal quotation marks omitted.) *People v. Coleman*, 183 Ill. 2d 366, 384 (1998). Based upon the record, the circuit court's determination was not manifestly erroneous, where the circuit court was in the best position to observe and determine the credibility of witnesses. The circuit court considered the evidence and determined that plea counsel was more credible than the defendant and that plea counsel's testimony was supported by correspondence. We are unable to conclude that the circuit court erred by denying the defendant's petition where the circuit court was in the best position to assess the credibility of the witnesses. The defendant has failed to show that plea counsel's conduct fell below an objective standard of reasonableness. The standard for ineffective assistance under *Strickland* has not been satisfied.

¶ 51　　The defendant also appeals the circuit court's denial of his amended motion to withdraw guilty plea and vacate judgment. The amended motion also alleged that his counsel provided ineffective assistance during plea negotiations, which resulted in the imposition of a significantly harsher sentence. The circuit court's denial of a defendant's motion to withdraw guilty plea should be reviewed for an abuse of discretion. *Boyd*, 2018 IL App (5th) 140556, ¶ 13. "An abuse of discretion occurs only where the court's ruling is so arbitrary or unreasonable that no reasonable person would take the view adopted by the trial court." *Boyd*, 2018 IL App (5th) 140556, ¶ 14. Challenges to guilty pleas based on ineffective assistance of counsel are subject to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504, 525-28 (1984). Based on the reasons discussed above, we similarly find that the circuit court did not abuse its discretion when it denied the defendant's motion to withdraw guilty plea and vacate judgment.

¶ 52                                    III. CONCLUSION

¶ 53    For the foregoing reasons, we affirm the judgment of the circuit court of Champaign

County.

¶ 54    Affirmed.